No. 56,638

Boston Daniels, Emanuel Northern, Accie L. Taylor, Willa McKinney, and Learned Latell Jennings, *Plaintiffs-Appellants,* v. Board of Commissioners of the City of Kansas City, Kansas, and the City of Kansas City, Kansas, *Defendants-Appellees.*

(693 P.2d 1170)

Opinion filed January 26, 1985.

*Grover G. Hankins,* of North, Bryant & Hankins, of Kansas City, argued the cause and was on the brief for the appellants.

*Michael P. Howe,* assistant city attorney, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Prager, J.: This is an action seeking judicial review of an ordinance adopted by the Board of Commissioners of the City of Kansas City granting a special use permit for the operation of a sanitary landfill to be located within the city. The action was brought, pursuant to K.S.A. 12-712, by certain property owners owning land adjacent to the proposed landfill site. This court has held that an action for injunctive relief may be used to challenge ordinances of a city which grant special use permits. *Weeks v. City of Bonner Springs,* 213 Kan. 622, 518 P.2d 427 (1974); *Gaslight Villa, Inc. v. City of Lansing,* 213 Kan. 862, 518 P.2d 410 (1974).

Following a hearing on the application for the special use permit, the Board of Commissioners (Board) of the city made comprehensive findings of fact which set forth the background,

chronology, procedure, and the evidence which the Board relied upon as a basis for granting the special use permit. The Board's findings of fact were as follows:

"1. The City of Kansas City, Kansas, on June 27, 1974, submitted a solid waste management plan to the Kansas Department of Health and Environment.

"2. Illegal dumping problems and the need for an intra-city sanitary disposal system to comply with State and Federal mandates have been serious concerns for the City for the past decade.

"3. On January 28, 1981, the Kansas Department of Health and Environment issued a directive to the Mayor of Kansas City to reevaluate the City's Solid Waste Management Plan. That directive outlined seven areas for investigation and evaluation. Immediately subsequent to the Kansas Department of Health and Environment's directive, Wilson and Company was directed by the City to conduct the required investigation and evaluation. The directive created a January 1, 1982, deadline for the restudied plan. (Exhibit No. 22)

"4. In June 18, 1981, Wilson Laboratories submitted the Solid Waste Management Evaluation to the City of Kansas City. In May of 1981, a proposed revision to the City of Kansas City, Kansas', Solid Waste Management Ordinance was submitted to the Board of City Commissioners for approval by Wilson and Company. These documents were studied by various City departments and the Board of City Commissioners in the following months. However, the alternative proposed, incineration, was found to be unacceptably costly and no action to amend the Solid Waste Management Plan or Ordinance was taken. (Exhibits Nos. 19 and 22)

"5. On February 9, 1982, a letter from the Kansas Department of Health and Environment extended the date for submittal of a Comprehensive Revision of the Solid Waste Management Plan to July 1, 1982, and included additional comments which required further study.

"6. On April 19, 1982, the Kansas Department of Health and Environment officials met with City officials in Topeka to further clarify the requirements of their directive of January 28, 1981. As a result of that meeting, the City outlined a new plan of action.

"7. On December 9, 1982, Resolution No. 35224 was adopted by the Board of City Commissioners authorizing the Mayor to execute a contract with Black & Veatch, Consulting Engineers, to restudy the City's Solid Waste Management needs. (Exhibit No. 16)

"8. In December, 1982, Western University Association and Browning-Ferris Industries filed a petition for a Special Use Permit to allow the placement and operation of a sanitary landfill in an area between 32nd Street and I-635, just south of the Missouri Pacific Railroad.

"9. On December 20, 1982, a Notice of Hearing before the Planning Commission was published in the official newspaper of the City of Kansas City, Kansas, calling for a public hearing to be held on the proposed Special Use Permit on January 10, 1983. On December 30, 1982, notices of the Planning Commission hearing were mailed to owners of property located within 200 feet of the area proposed for the Special Use Permit. (Exhibit No. 4)

"10. The proposed Special Use Permit was considered on January 10, 1983.

Said public hearing was continued until January 21, 1983. At the conclusion of the public hearing on January 21, 1983, the Planning Commission recommended the petition for denial by a vote of 7-1. No specific reasons were provided in relation to the denial. (Exhibits Nos. 8 and 9)

"11. On January 26, 1983, a public hearing was held before the Board of City Commissioners of Kansas City, Kansas. (Exhibit No. 10)

"12. At this hearing, letters in favor of the proposed Special Use Permit were received by the Board of City Commissioners from Halco, Incorporated, K.C. Abrasive Company, Industrial Lumber Company, International Harvester, Certain-Teed Corporation, the Port Authority of Kansas City, Kansas, Harding Glass Industries, Wenzel Machinery Co., Inc., Mid-West Conveyor, Sealright Co., Inc., Firestone Truck Tire Center, American Laminates, Inc., and the Industrial Council of the Kansas City, Kansas, Area Chamber of Commerce.

"13. At this hearing, a letter from Charles H. Linn, P.E., Chief of the Engineering and Sanitation Section of the Bureau of Environmental Sanitation, Kansas Department of Health and Environment, was submitted. In part, this letter stated:

" 'Our review indicates that this is a suitable location for a sanitary landfill. Given adequate planning and development, we believe that an excellent landfill can be operated on this site.' (Exhibit No. 3)

"14. At this hearing, Darrel D. Newkirk, M.D., M.P.H., Director of the Wyandotte County Department of Health, submitted a letter which in part stated:

" 'For these reasons, therefore, the City-County Health Department is strongly supportive of the development of a properly planned and designed sanitary landfill in the City. We think it would definitely help solve some of our illegal dumping problems. Our agency, by legal mandate, would assure that any sanitary landfill developed in the City would be routinely inspected and properly regulated.' (Exhibit No. 2)

"15. At this hearing, Bruce M. Browne, P.E., Director of the City Water Pollution Control Department, after review and study of the Proposal by the Water Pollution Control Department, submitted a letter stating that the department had no objection to this proposed sanitary landfill. His opinion was based in part on review of the Engineering study provided by the petitioner. (Exhibit No. 2)

"16. At this hearing, Gary C. Stubbs, the City's Director of Public Works, after review and study of the Proposal by the Engineering Department, submitted a letter stating that:

" '. . . the Engineering Department supports the proposal for the Browning-Ferris landfill development as represented by the [engineering study] report dated December, 1982, and would be willing to support other similar developments which solve the access provision without disturbing local streets and the adjacent local neighborhoods.' (Exhibit No. 2)

"17. At the hearing, Robert Settich, Executive Director of the Kansas City, Kansas, Port Authority, after review and study of the proposal, submitted a letter stating the Port Authority's support of the proposed landfill:

" 'If the community is to grow, it must be able to provide the services that growth demands. Solid waste disposal is one of those essential services that a community must recognize and address in a positive manner if it wants to

shape its own future. While I am not qualified to give an unreserved endorsement of the new landfill from an engineering standpoint, the site chosen does seem to have positive potential, and no unsolvable problems have yet been identified.' (Exhibit No. 2)

"18. Various other comments by city, county, state, and administrative officials were received regarding this proposed sanitary landfill. All of these communications were delivered to this Board and reviewed prior to its public hearing on January 26, 1983. (Exhibits Nos. 2 and 3)

"19. A letter voicing concern over the landfill was received from Kansas State Representative Clarence C. Love. His major concern was that there be no access to the landfill site through residential neighborhoods. (Exhibit No. 6)

"20. Fred Whitehead, editor and publisher of *The Quindaro* magazine, expressed opposition to this sanitary landfill proposal because the site has historical significance. He stated, in part:

"'.Therefore, it was with alarm and dismay that I read of plans to convert this historic area into a dump site. Indeed, the particular area planned for the dump site includes not only the statue and new historic-site plaza around it, on the corner of 27th and Sewell, but the beautiful old cemetery on the crest of the bluff overlooking the entire river valley.' (Exhibit No. 7)

"21. In addition to the written communications received, persons both for and against this petition spoke at the public hearing on January 26, 1983. All due process rights of an opportunity to be heard and the right to cross-examine/question the other side were respected. Evidence of this is the fact the public hearing on this petition consumed approximately four continuous hours from 8:00 p.m. to midnight. (Exhibit No. 10)

"22. Those who spoke in opposition voiced concern centered generally around the following:

"(a) traffic access through residential neighborhoods;

"(b) the historical value of the subject area;

"(c) prevention of contamination of the City water supply; specifically, two communications from the Board of Public Utilities stating there must be stringent engineering safeguards utilized to assure safety to its water supply. (Exhibit 30)

"(d) possible diminished residential property values;

"(e) trash and vermin control. (Exhibits Nos. 8, 9, and 10)

"23. Various protest petitions were received by the City Planning Commission, City Clerk, and this Board. . . . The vast majority were not notarized, acknowledged or in any way verifiable. In addition, review of the petitions indicates most signatures were of persons not in the subject area or in close proximity thereto.

"24. Special Use Permits are authorized for sanitary landfill operations pursuant to City Code of Ordinances, Section 27-103(A)2(k). Code Section 27-103(B)1 sets out the basic criteria for review of special use permit petitions. There are eight general areas which this Board must consider in reviewing special use permit petitions. Those are:

"a. Whether the proposed use will destroy the aesthetics of the surrounding development (to protect the character of the surrounding development);

"b. Whether the proposed use will result in increasing the amount of vehicular

traffic to the point where it exceeds the capacity of the street network to accommodate it;

"c. Whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use of adjoining property;

"d. Whether the noise, vibration, dust, or lighting that would normally be associated with such use is of such duration and intensity as to be objectionable to adjacent property;

"e. Whether the proposed use would pollute the air or water;

"f. Whether the use would destroy an irreplaceable natural resource;

"g. Whether the construction activities or quality of maintenance associated with the use would cause excessive erosion; and

"h. Whether the proposed use would result in overcrowding of land or cause an undue concentration of population. (Exhibit No. 28)

"25. At the January 26, 1983, public hearing, Michael Lawlor, Vice-President of Browning-Ferris Industries of Kansas City, Inc., addressed each of these criteria for review in detail. (Exhibit No. 27)

"26. No person who appeared in opposition to the proposed rezoning at either the Planning Commission Hearing or the Board of City Commissioners' Hearing submitted any documentary evidence, letters or expert testimony in support of their opposition to the proposed petition; nor was any of the oral testimony submitted sufficient to refute the totality of the evidence adduced by the proponents of the granting of the special permit. (Exhibits Nos. 8, 9, and 10)"

In its resolution granting the special use permit, the Board accepted certain commitments made by Browning-Ferris Industries (BFI) to satisfy some of the objections presented by the landowners at the hearing. The Board ordered that there should be certain conditions precedent to any operational or property site activities on the landfill site by BFI:

"(a) B.F.I. will provide interchange on I-635 for access to the landfill which will allow 27th Street to be free of landfill related traffic. Maintenance and access control will also be provided by B.F.I. In addition to the B.F.I. commitment, the I-635 interchange will be the only access to the landfill and no solid waste will be accepted until the interchange is complete.

"(b) B.F.I. will procure a historical survey, meeting the guidelines of the Kansas State Historical Society which will be completed prior to site preparation activities. Findings of significance should be followed with an archaeological salvage operation. Building remains of significance should be left undisturbed and protected from landfill activities by fencing and other necessary measures. If leaving building remains is not compatible with landfill activities, B.F.I. shall submit a proposal suggesting how the historical significance can be retained through an alternate, such as relocation. This will require approval by the Governing Body. In addition, access to any sites of historical significance will be provided during the active life of the landfill upon request and adequate notice during periods when the landfill is closed.

"Specifically, B.F.I. will provide access to the existing cemetery at 32nd Street and maintain said road and cemetery.

"(c) That surface runoff diversion structures shall be constructed surrounding the landfill capable of diverting away from the landfill all of the surface water runoff from the upland drainage area from no less than the 10 year 24 hour precipitation event.

"(d) That an acoustical study to determine potential noise problems shall be completed by B.F.I. prior to any site preparation activities, and that B.F.I. still comply with all recommendations of the acoustical expert necessary to maintain an acceptable environment. An acceptable environment will be defined as meeting H.U.D. standards considered normally acceptable, and forecasts shall be based on U.S. E.P.A. 1975 Report 550/9-76-004: 'Noise Emission Standards for Construction Equipment,' or updates by U.S. E.P.A. Should the City enact a comprehensive noise control ordinance, B.F.I. shall comply.

"(e) Blowing refuse shall be controlled by proper alignment of unloading areas and through the use of downwind portable wire fabric fencing. Permanent fencing shall be provided adjacent to residential areas to control not only litter, but also to prevent access."

In addition to these conditions precedent, the Board established certain conditions subsequent to be complied with by BFI *after* it undertook actual operation of the sanitary landfill. They are as follows:

"(a) 'Compliance by B.F.I. with the City of Kansas City, Kansas,' Solid Waste Management Plan. It is understood that said compliance must also be made with any revised Solid Waste Management Plan adopted by the City.

"(b) Compliance by B.F.I. with any adopted Solid Waste Management Ordinance of the City in regard to its operation of this proposed sanitary landfill.

"(c) That the B.F.I. sanitary landfill operation will be in accord with the criteria for evaluating sanitary landfill sites and operations presented by Black & Veatch, Consulting Engineers. Said Engineers are presently conducting a study on behalf of the City of Kansas City, Kansas.

"(d) That not only shall all hazardous waste be entirely excluded from the landfill, but also, at least, the following: liquid industrial wastes such as acids, caustics, metal-finishing baths, paint, strippers, waste oils, waste solvents or other materials which are ignitable, corrosive, reactive, toxic, or infectious; industrial wastewaters; sanitary sewage, septic tank, cesspool or pit toilet cleanings; sanitary sewage sludges or nonhazardous industrial sludges not dewatered to a solid or semi-solid condition; and pathological wastes such as tissue, culture media, waste drugs and pharmaceuticals.

"(e) That free disposal privileges shall be provided to Wyandotte County residents for personal domestic refuse.

"(f) That Browning-Ferris Industries shall have no vested right to accept solid wastes during all daylight hours as it has committed to do, but shall anticipate that hours and days of operation will be further regulated by City ordinance.

"(g) That in deference to the City's water supply, the naturally occurring groundwater quality beyond the disposal site boundary (the area of actual

waste disposal) shall not be degraded or if it is currently of adequate quality for drinking water supply, it shall not be degraded to a point where additional treatment would be required for use. It should be anticipated that any such degradation will result in the imposition of fines or suspension of landfill activities.

"(h) That the City implies no approval of B.F.I.'s proposal to provide 2 feet of final cover and that ordinance changes should be anticipated that would require a certain depth of topsoil and/or additional depth of final cover so that more diverse plant life can be supported and erosion controlled."

In Finding of Fact No. 29, the Board required a separate agreement between the City of Kansas City, Kansas, and BFI in regard to the use of certain city property located within and abutting the proposed landfill site.

Following these extensive Findings of Fact, the Board adopted Conclusions of Law as follows:

"1. Special use permits are based upon the zoning power granted by the State but, by definition, empower governing bodies to impose conditions upon the granting of such permits to protect the health, safety and welfare of the public.

"2. The City of Kansas City, Kansas has legislatively adopted a Special Uses ordinance setting out the procedure and basis for review in considering special use permit petitions. In this regard, the Board concludes that this Special Use Permit:

"(a) Will not destroy the aesthetics of surrounding developments but rather will eliminate the use of this area for illegal dumping and upon completion of the landfill provide an aesthetically attractive park development.

"(b) Vehicular traffic will not exceed street capacity because no traffic access will be allowed on existing residential streets but be exclusively routed off the proposed interstate exchange.

"(c) This proposed sanitary landfill is crucial for the efficient disposal of sanitary refuse and will benefit the general public for many years. Proper operation will assure no adverse effects to adjoining property.

"(d) Operational conditions and controls previously cited, i.e., an acoustical study regarding noise, on site dust controls, including a water truck, and earth and tree berming, no nighttime operations, etc., will prevent objectionable effects to adjoining properties.

"(e) Air and water pollution will be avoided as represented by petitioner; based upon the study of the engineering firm, Woodward-Clyde, and the engineering construction and maintenance standards by the firm of Schlup, Becker & Brennan.

"(f) There will be no destruction of an irreplaceable natural resource. As cited above, a historical survey will be conducted to identify and preserve significant historical resources. In addition, preservation and enhancement of an existing cemetery in the subject area will be provided by the petitioner.

"(g) Construction and maintenance of this operation will not cause excessive erosion but will in fact control and remedy an existing soil erosion problem.

"(h) This proposed use will not result in overcrowding of land or cause undue concentration of population.

"3. This Governing Body concludes that the instant petitioner has met the criteria of the City's Ordinance regarding special use permits subject to compliance with the conditions hereinbefore set out, and, therefore, the granting of this Special Use Permit is reasonable in light of the foregoing."

Following the adoption of the resolution granting the special use permit for operation of the sanitary landfill, the plaintiff landowners filed this action in district court pursuant to K.S.A. 12-712 to determine the validity and reasonableness of the Board's resolution granting the special use permit. The petition filed by the plaintiffs was essentially a suit in equity for injunctive and declaratory relief. At the outset, a temporary restraining order was issued which was subsequently modified at the time a temporary injunction was issued. In addition, the plaintiffs filed a motion to amend their petition to add new causes of action. This motion was filed one month prior to the set trial date and one week prior to the discovery deadline. This motion was denied. These matters will be discussed later in the opinion.

The case was tried to the court and, after four days of trial, the case was taken under advisement. Thereafter, the trial court rendered its decision adopting certain suggested findings of fact and conclusions of law submitted by the city with certain modifications, and denying the plaintiff's petition for relief. The trial court entered judgment in favor of the defendant city, holding that the decision of the Board of City Commissioners granting the special use permit was not arbitrary or capricious but in fact was based upon substantial competent evidence and was reasonable.

In arriving at its decision, the district court first considered the scope of judicial review. The court noted the basic principles of law to be applied in reviewing a decision of the governing body of a city in a zoning or special use permit case. These rules are stated in *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980), as follows:

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.
"(2) The district court's power is limited to determining
        "(a) the lawfulness of the action taken, and
        "(b) the reasonableness of such action.
"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreason-ableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court."

These rules were more recently restated in *Taco Bell v. City of Mission*, 234 Kan. 879, 885-86, 678 P.2d 133 (1984).

The district court, in determining the issue of reasonableness, observed that the Board of City Commissioners had considered the factors which had been established for the granting of special use permits. These factors are set forth in the Board's finding of fact No. 24 noted above. The district court then concluded that the decision of the Board granting the special use permit was lawful, reasonable and not arbitrary or capricious. The plaintiffs appealed, and the appeal was transferred to the Supreme Court for determination.

The plaintiffs raise three points on this appeal. The primary point is that the trial court erred in finding that the action of the Board in granting the special use permit to BFI for the operation of a sanitary landfill in a residential zoned area was lawful and reasonable.The scope of judicial review in matters involving special use permits is set forth above. We have considered the entire record in the case and have concluded that there is substantial competent evidence to support the district court's findings of fact and conclusions of law; that the district court properly considered the pertinent factors for determining the reasonableness of the city's action; and that the trial court did not err in determining that the decision of the Board of City Commissioners to grant the special use permit for the landfill was lawful and reasonable.

The plaintiffs next maintain that the trial judge erred in dissolving a temporary restraining order previously entered by another judge. They contend that injunctive relief was necessary

to protect the present and future property rights of the plaintiffs. We find no error in this regard. At the outset of the case on application of plaintiffs, a temporary restraining order was granted on March 31, 1983, restraining the city from entering into any lease agreement with the owners for use of city property adjacent to the landfill tract. This temporary restraining order was later modified after a hearing on a motion for a temporary restraining order on April 13, 1983. At that time, the district judge, who ultimately handled the trial of the case on the merits, issued a temporary injunction prohibiting certain physical acts upon the subject property. The effect of the judge's order was to maintain the status quo as far as any changes in the physical use of the property were concerned until the case was finally determined on the merits. We cannot say that the trial court abused its discretion in modifying the previously issued restraining order under the circumstances.

The final issue raised by the plaintiffs is that the trial court abused its discretion by denying plaintiffs' motion to amend their petition. Simply stated, the plaintiffs sought to enlarge the issues in the case in order to raise constitutional issues, certifying class status for the plaintiffs, and permitting the plaintiffs to have a jury trial to determine whether they were entitled to damages in excess of one million dollars. We hold that the trial court did not abuse its discretion in denying the motion to amend. This motion was made only one month prior to the set trial date and one week prior to the expiration of the discovery deadline. At that point, a period of ten months had elapsed since the case was filed in which there had been numerous preliminary hearings, discovery, and pretrial conferences. We find no abuse of discretion by the trial court.

We wish to emphasize, however, that this holding does not preclude the plaintiffs from seeking relief from the district court at some future time. As noted above, the city, in granting the special use permit for the landfill, conditioned the granting of the permit on stated conditions precedent and conditions subsequent in order to protect the rights of the landowners. If those requirements are not properly complied with or if the plaintiffs, as adjacent landowners, are subjected to intolerable conditions on the landfill property which would constitute a nuisance, then the plaintiffs may seek appropriate relief in the district court.

For the reasons set forth above, the judgment of the district court is affirmed.