No. 57,559

K-S Center Company, *et al., Appellants,* v. City of Kansas City, Kansas, *Appellee.*

(712 P.2d 1186)

Opinion filed January 17, 1986.

*Robert J. Campbell,* of Brown, Koralchik & Fingersh, of Overland Park, argued the cause, and *Elizabeth Drill Hartsook,* of the same firm, was with him on the brief for appellants.

*Michael P. Howe,* assistant city attorney, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Herd, J.: This is an appeal from a district court's determination that the City of Kansas City acted reasonably in granting a special use permit to R. E. Wolfe Enterprises of America, Inc., for the operation of a sanitary landfill within the city.

All of the plaintiffs in this action either live or operate businesses adjacent to, or in the near proximity of, the proposed sanitary landfill. Many of the plaintiffs are general partners in K-S Center Company, Inc., which owns and operates the Indian Springs Shopping Center (Indian Springs). Indian Springs is an enclosed shopping center located at 4601 State Avenue in Kansas City. It is near the proposed landfill site.

The plaintiffs seek review, pursuant to K.S.A. 12-712, of the reasonableness of the City Council's grant of a special use permit

for the operation of the sanitary landfill. We have recently held that K.S.A. 12-712 is a proper statute under which to seek review of a city's action on an application for a special use permit. *Sprint Print, Inc. v. City of Overland Park,* 238 Kan. 230, 708 P.2d 210 (1985).

Before considering this case, we point out its similarity to *Daniels v. Board of Kansas City Comm'rs,* 236 Kan. 578, 693 P.2d 1170 (1985).

· *Daniels* involved an application for a special use permit by Browning-Ferris Industries (BFI). BFI sought approval for the placement and operation of a sanitary landfill in an area between 32nd Street and I-635, just south of the Missouri Pacific Railroad. The Board of City Commissioners granted the special use permit subject to the performance of certain commitments made by BFI. These commitments included both conditions precedent to the operation of activities on the landfill site and conditions subsequent to actual operation of the sanitary landfill. Plaintiff landowners petitioned the district court, pursuant to K.S.A. 12-712, to determine the validity and reasonableness of the special use permit. The case was tried to the same district judge who tried the instant case. The trial court concluded that the Board's grant of the special use permit was lawful and reasonable and not arbitrary and capricious. We affirmed, finding substantial competent evidence to support the district court's findings of fact and conclusions of law. The landfill at issue in the *Daniels* case has not yet become operative since BFI is in the process of satisfying the conditions placed on the permit by the City.

The facts giving rise to this controversy are:

In September of 1983, R. E. Wolfe Enterprises of America, Inc., (Wolfe) a sanitary landfill operator, filed a petition to obtain a special use permit to operate a sanitary landfill in an area bounded by Interstates 70 and 635 and K-32 Highway. With its petition, Wolfe submitted a Preliminary Engineering Report through its consulting engineers, Burns & McDonnell.

The City professional staff evaluated the engineering report and found certain technical information missing. An exchange of letters followed which failed to resolve the staff's concerns. Thus, the staff reports both to the Planning Commission and the Council failed to include a recommendation on the landfill proposal. In spite of this, after a public hearing the planning

commission unanimously recommended the special use permit be issued to Wolfe.

Following the favorable recommendation from the Planning Commission, the City Council held a public hearing on October 27, 1983. At the hearing, petitions both for and against the proposed landfill were received. A lengthy presentation was made by R. E. Wolfe and R. E. Wolfe Enterprises of America, Inc., and the company's attorneys, chief engineer, consulting engineers and project manager. Wolfe cited its record in operating landfills, the need for a landfill within the City, the central location of and access to the proposed site and certain geological information.

The owners of Indian Springs appeared and spoke in opposition to the landfill, citing several concerns, including gas recovery, odors, dust and groundwater. They also argued the location of the landfill would create aesthetic and image problems for Indian Springs and have a potentially devastating effect on the future of the shopping center and surrounding commercial and residential development.

Appellants also cited the alleged failure of the City to consider the eight factors suggested by this court in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978), to be utilized in land use decisions.

At the conclusion of the hearing, the City Council voted 5 to 2 to grant preliminary approval of the special use permit, subject to the drafting of suggested Findings of Fact and Conclusions of Law by the City Planning and Legal Departments for later submission to the Council.

After further review the Council, on December 15, 1983, unanimously adopted the following Findings of Fact (in pertinent part) and Conclusions of Law:

"II.  Findings of Fact—Evidence received and Reviewed.
   "1.  All Findings of Fact made, and the Exhibits listed thereto in Section I, above, are hereby incorporated by reference as if fully set out in this Section II. Findings of Fact—Evidence Received and Reviewed.
   "2.  Petitioner, *R. E. Wolfe Enterprises of America, Inc.* submitted a Preliminary Engineering Report through its engineers, Burns and McDonnell, regarding the proposed landfill in September, 1983. After review and comments by City Engineering, Planning, Water Pollution, Air Pollution, Health and the Board of Public Utilities, Burns and McDonnell submitted a supplemental report. These

reports were submitted and reviewed by the City Planning Commission.

"3. Dr. Darrell Newkirk, Director of Kansas City/Wyandotte County Health Department, Gary Stubbs, City Public Works Director, and Frederick Backus, P.E. City Engineer, all reviewed the proposed landfill and sent communications to the Planning Commission in support of the proposal.

"4. At the Planning Commission Hearing, Joseph H. McDowell, and Chuck Swoboda, attorneys, R. E. Wolfe, Petitioner, Phil Sutton and Robert Robinson, engineers, all on behalf of the petitioner, were present and spoke in favor of the landfill.

"5. At the Planning Commission Hearing, persons appeared in opposition to the landfill including various residents of the surrounding area and a Mr. John Bowlin, representing merchants of Indian Springs Shopping Center, who spoke. Some of the concerns they expressed were blowing trash, odor controls, potential blasting and combustion fire control of the landfill.

"6. A property owner in the area, Rosalie Douglas; the president of Brown Wrecking Company, Harold Brown, and another resident of Kansas City, Kansas, appeared and spoke in favor of the landfill proposal. Their comments centered around the serious need for a landfill in the City and previous successful operation of another landfill in the 1970's at 5th and Garland in Kansas City, Kansas, which is now Garland Park.

"7. Prior to the City Council's public hearing, Burns and McDonnell Consulting Engineers submitted a responsive update of its engineering study to the City Planning Department.

"8. Prior to the City Council public hearing several Council Members made an on site and perimeter inspection of the proposed landfill site.

"9. Gilbert A. Pintar, Director of the City Planning Department who serves as Secretary of the City Planning Commission submitted his staff opinion, and the minutes including the unanimous recommendation for approval by the City Planning Commission to the City Council through a communication dated October 24, 1983, to the City Administrator, M. James Medin.

"10. At the City Council Hearing signed protest petitions from citizens were received which stated:

"The following are concerned taxpayers of Wyandotte County who are opposed to the landfill being proposed at 47th Terrace and K-32. This landfill is within four blocks of Indian Springs Shopping Mall, adjacent to Indian Springs Medical Building at 47th and Orville, three blocks south of 47th Street which includes various businesses and surrounding residential community.

"11. At the Council Hearing signed petition[s] in favor of the proposed landfill were received which stated:

"We, the undersigned, hereby declare that we are in support of

the proposed R.E. Wolfe Enterprises, Inc. Sanitary Landfill to be located near K-32 Highway, (Tobin Mine) in Kansas City, Kansas—Wyandotte County. We understand the need for a properly operated landfill and the importance it will have on the future growth of Kansas City, Kansas, and Wyandotte County. We understand that the Indian Springs Shopping Center is 2,000 feet away from the proposed landfill site. The sanitary landfill will not affect our willingness to shop at the Indian Springs Shopping Center.

"12. At the Council hearing, the petitioner, R. E. Wolfe of R. E. Wolfe Enterprises of America, Inc. again appeared with his attorneys, Chief Engineer, Consulting Engineers and Project Manager. They made a lengthy presentation and answered numerous questions by City Council Members and citizens. In addition, Rosalie Douglas of 5492 Muncie Drive, testified in favor of the proposal, stating she had a business near the 5th and Garland landfill and witnessed that operation daily from its inception through the closing of the landfill and the use of the site as a park. Mrs. Douglas stated that no problems arose concerning odors, blowing papers, or fencing and screening.

"13. At the Council Hearing, Mr. R. J. Campbell, Attorney-at-Law, appeared and spoke on behalf of the owners of Indian Springs Shopping Center in opposition to the landfill. His opposition included concerns regarding gas recovery, odors, groundwater and dust. Mr. Campbell submitted an analysis by Howard, Needles, Tammen & Bergendoff, Engineering Consultants, regarding the Burns and McDonnell and Black and Veatch reports. In addition to his technical concerns, Mr. Campbell argued the location of the landfill at this site would negatively impact and create aesthetic and image problems for Indian Springs Shopping Center. Finally, Mr. Campbell contended the landfill was an unsound land use decision, contrary to the criteria enumerated by the Kansas Supreme Court to be utilized in land use decisions.

"14. Other citizens, business representatives, and one of the Indian Springs Shopping Center owners appeared and spoke in opposition at the Council Hearing.

"15. City Administrator, M. James Medin made a presentation at the City Council hearing. His comments analyzed the various factors both pro and con in landfill proposals. Drawing on his previous experience as City Administrator in Fond du Lac, Wisconsin, he concluded that a properly managed and operated sanitary landfill would not detrimentally affect adjacent properties.

"16. Special Use Permits are authorized for sanitary landfill operations pursuant to City Code of Ordinances, Section 27-103(1)(A)2g. Code Section 27-103(1)(C)1 sets out the basic criteria for review of special use permit petitions. There are eight general areas which this Board must consider in reviewing special use permit petitions. Those are:

"a. Whether the proposed use will destroy the aesthetics of the surrounding development (to protect the character of the surrounding development);

"b. Whether the proposed use will result in increasing the amount of vehicular traffic to the point where it exceeds the capacity of the street network to accommodate it;

"c. Whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use of adjoining property;

"d. Whether the noise, vibration, dust, or lighting that would normally be associated with such use is of such duration and intensity as to be objectionable to adjacent property;

"e. Whether the proposed use would pollute the air or water;

"f. Whether the use would destroy an irreplaceable natural resource;

"g. Whether the construction activities or quality of maintenance associated with the use would cause excessive erosion; and

"h. Whether the proposed use would result in overcrowding of land or cause an undue concentration of population.

"17. In addition to these criteria adopted by city ordinance the Supreme Court of Kansas has listed factors to be considered in making zoning decisions. While the landfill proposal is not a zoning change the below factors are considered:

"(1) The character of the neighborhood;

"(2) the zoning and uses of properties nearby;

"(3) the suitability of the subject property for the uses to which it has been restricted;

"(4) the extent to which removal of the restrictions will detrimentally affect nearby property;

"(5) the length of time the subject property has remained vacant as zoned;

"(6) the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner;

"(7) recommendations of permanent and professional staff; and

"(8) conformance to Master Plan.

"18. This Council, in addition to considering above listed criteria, specifically finds this proposed sanitary landfill consistent with the Solid Waste Management Study prepared for the City by Black and Veatch. This site and method of solid waste disposal is in fact highly recommended in that study.

"19. At the public hearings, on this proposed Special Use Permit, evidence and testimony was presented which addressed each of these criteria for review.

"20. No person who appeared in opposition to the proposed Special Use Permit at either the Planning Commission Hearing or the City Council Hearing submitted any documentary evidence, letters or

expert testimony in support of their opposition to the proposed petition sufficient; nor was any of the oral testimony submitted sufficient to refute the totality of the evidence adduced by the proponents of the granting of the Special Use Permit.

"21. That the attached Exhibit A, representing the documentation received and considered by this Council in the hearing and processing of this Special Use Permit is hereby incorporated by reference into these Findings of Fact as if totally set out herein.

"22. That this quasi-judicial review has at all times been conducted as a review of a Special Use Permit petition for a five-year permit and not a change of zoning application. Specifically, with reference to objections on the issue of Master Plan conformance, it is considered and found that this Special Permit decision will not change the zoning of the subject property, that the existing implementation of the Master Plan has gone unutilized for fourteen years, that the mine situation and lack of infrastructure casts serious doubt on current development of the subject property in accord with the Master Plan.

"III. Conditions of Approval of Special Use Permit.

"1. This Council accepts the following commitments of R. E. Wolfe, Enterprises of America, Inc., makes Findings of Fact with regard to them, and stipulates that they are conditions precedent to any operational or property site activity by the petitioner.

"(a) Final plans shall be submitted to the Planning Commission and City Council for approval. Until final plans are approved, site preparation activities shall not begin. The Special Use Permit is dependent on the approval of final plans. All activities shall be carried out in conformance with the approved final plans. The final plans shall include:

"(1) Sight line surveys for points along the northern perimeter of the landfill property from the westernmost point along Muncie Drive to 47th Street and Orville. Such surveys should be provided at an average 400' interval; should select particular sight lines where the sanitary landfill is most likely to be visible; and should envision the landfill at approximately its final contours.

"(2) All information and plans required by the State of Kansas for a permit to operate a sanitary landfill.

"(3) Detailed response as applicable to the Howard, Needles, Tammen and Bergendoff analysis.

"(4) A leachate control plan.

"(5) Gas recovery and control systems plan.

"(6) A screening, landscaping and fencing plan.

"(7) Plan for controlling illegal dumping around entrance during non-operational periods.

"(8) Details of the noise impact analysis.

"(9) Detailed survey information for all undermined areas which extend beyond the boundaries of the sanitary

landfill as delineated in the Special Use Permit application.

"(10) Plans to stabilize the improperly mined portion of the quarry with fly ash and other suitable materials.

"(b) Access shall be limited to the existing drive on to K-32 Highway, and a de-acceleration lane shall be provided on the North side of K-32 consistent with the existing road cut as practicable. Conformance shall be made with any other road improvements or alterations as required or recommended by the Kansas Department of Transportation.

"(c) All surface drainage structures shall be designed to accommodate a minimum 10 year, 24-hour precipitation event.

"(d) Adjacent residences and businesses shall be protected as necessary to assure that an acceptable noise environment as defined by H.U.D. standards is maintained.

"(e) Adjacent residences and businesses shall be visually screened from the sanitary landfill working face disposal operations from the outset of its operation and during its active life. Berms, existing natural features, retention of existing tree cover, screen plantings, wood screening fences or any combination thereof may be utilized, but whatever is selected must remain in place during the lifetime of the sanitary landfill and be an effective visual screen. Where existing tree cover is to be retained, at least a 100' wide undisturbed area must be retained. Where wood screen fencing is to be utilized it must be supplemented with landscape plantings. Along the West boundary there shall be a 125' wide undisturbed area and an additional 125' setback from the undisturbed area to any disposal operations. The sanitary landfill working face disposal operations shall not be visible from normal eye level upon the Indian Springs Shopping Center existing building entrances and parking areas. The boundary along Interstate 70 shall be screened in accordance with the requirements and plans approved by the Kansas Department of Transportation.

"(f) A long term contract from a reliable supplier to dispose of fly ash in quantities adequate to assure stabilization of the mine in a timely fashion. In this regard, petitioner agrees to reasonably negotiate with the City, as may be legally possible, contracts for disposal with the Board of Public Utilities and Water Pollution Control Department. Specifically, a possible joint venture incineration program shall be examined between petitioner and the City for processing of Water Pollution Control materials.

"(g) Blowing refuse shall be controlled by proper alignment of unloading areas and through movable litter fences maintained near the active face. A six foot high fence shall surround the perimeter of the landfill area and entrances to control access and to provide litter control.

"(h) The installation of additional fire hydrants in conformance with the requirements of the Fire Department.

"2. This Council makes the following Findings of Fact and stipulates that each shall be a condition subsequent to continuation of the actual sanitary landfill operation:

"(a) That not only shall all hazardous waste be excluded from the landfill, but also, at least the following: liquid industrial wastes such as acids, caustics, metal-finishing baths, paint, strippers, waste oils, waste solvents or other materials which are ignitable, corrosive, reactive, toxic, or infectious, industrial wastewaters, sanitary sewage, septic tank, cesspool or pit toilet cleanings, sanitary sewage sludges or non-hazardous industrial sludges not dewatered to a solid or semi-solid condition, and pathological wastes such as tissue and culture media, unless autoclaved.

"(b) Compliance with any adopted solid Waste Management Ordinance of the City in regard to the operation of this proposed sanitary landfill.

"(c) That the hours of operation for accepting waste shall not extend beyond 7 a.m. to 5 p.m., with disposal and covering operations closing not later than 7:00 p.m. or those hours and days of operation as further regulated by City ordinance.

"(d) That the naturally occurring groundwater quality beyond the disposal site boundary shall not be degraded. It should be anticipated that any such degradation will result in the imposition of fines or suspension of landfill activities.

"(e) That the City implies no permanent approval of the proposal to provide 2 feet of final cover and that ordinance changes should be anticipated that would require a certain depth of topsoil and/or additional depth of final cover so that more diverse plant life can be supported and erosion controlled.

"(f) Odors should be controlled to the degree technically feasible and may be required to go beyond mere compliance with federal air pollution standards.

"(g) At all times the landfill working face disposal operations shall be visually screened from pedestrian view at eye level at any point on the Indian Springs Shopping Center's existing parking areas or building entrances.

"(h) A noise environment shall be maintained at or below those levels considered acceptable by the Department of Housing and Urban Development.

"(i) The operators of the sanitary landfill shall have no automatic vested rights in the preservation of the landfill operating standards of today. Lawfully and reasonably revised and updated standards may be imposed.

"(j) Washing facilities may be required on the site to prevent tracking of mud, etc. beyond the boundaries of the site.

"(k) No blasting will be permitted without permission from the City Council.

"(l) That petitioner shall comply and pay any regulatory fees or franchise taxes which the City may adopt and impose.

"IV.                          CONCLUSIONS OF LAW

"1.   Special use permits are based upon the zoning power granted by the State but, by definition, empower governing bodies to impose conditions upon the granting of such permits to protect the health, safety and welfare of the public.

"2.   The City of Kansas City, Kansas, has legislatively adopted a Special Uses ordinance setting out the procedure and basis for review in considering [a] Special Use Permit petition. In this regard, the Council concludes that this Special Use Permit:

"(a) Will not destroy the aesthetics of surrounding developments but rather will be operated in such a manner as to buffer and screen potential objectionable sights and upon completion of the landfill provide an aesthetically attractive green space.

"(b) Vehicular traffic will not exceed street capacity because no traffic access will be allowed on residential streets but be exclusively routed on K-32 Highway.

"(c) This proposed sanitary landfill is crucial for the efficient disposal of sanitary refuse and will benefit the general public for many years. Proper operation will assure no adverse effects to adjoining property.

"(d) Operational conditions and controls previously cited, *i.e.,* an acoustical study regarding noise, on site dust controls, including a water truck, and earth and tree berming, no nighttime operations, etc. will prevent objectionable effects to adjoining properties.

"(e) Air and water pollution will be avoided as represented by petitioner; based upon the study and the construction and maintenance standards by the engineering firm, Burns & McDonnell.

"(f) There will be no destruction of an irreplaceable natural resource.

"(g) Construction and maintenance of this operation will not cause excessive erosion but will in fact eliminate and remedy an existing and potentially hazardous mine collapse.

"(h) This proposed use will obviously not result in overcrowding of land or cause undue concentration of population.

"3.   In addition, although the above mentioned Supreme Court of Kansas suggested factors for consideration in change of zoning cases are not applicable to this Special Use Permit proceeding, this governing body concludes:

"(a) The character, the zoning and the uses of the surrounding neighborhood are primarily low density and sparse residential, a single development devoted to office and professional use, and a commercial shopping center—all of which shall be pro-

tected by existing land buffers, highway systems and affirmative screening steps.

"(b) There is poor suitability for residential development on the subject property as it currently exists because of the topography and the mines.

"(c) As mentioned earlier, nearby properties will be adequately protected and the use as a landfill is limited and fixed durationally.

"(d) The bulk of the subject property has always been vacant with a rock quarry and an illegal dump the only uses in recent history.

"(e) A tremendous benefit to the public's health, safety and welfare will inure with the establishment of this landfill by way of satisfying a crucial community need for safe, professional solid waste disposal with no undue hardships to adjacent properties.

"(f) The City's professional staff properly analyzed, collected and processed all available information and presented it to this governing body for its decision.

"(g) The City's Master Plan for this area has gone unutilized and the viability of development in accord with the plan is dubious.

"4. This proposal is in accord with the findings and conclusions reached in the Solid Waste Management Study prepared by Black and Veatch, Consulting Engineers, for the City of Kansas City, Kansas.

"5. This governing body concludes that the instant petitioner has met the criteria of the City's ordinance regarding special use permits, subject to compliance with the conditions hereinbefore set out, and, therefore, grants this Special Use Permit."

The Council also accepted a Unilateral Agreement executed by R. E. Wolfe Enterprises of America, Inc., wherein Wolfe agreed to the terms and conditions set forth in the Findings and Conclusions.

Prior to the formal adoption of the Findings of Fact and Conclusions of Law, the plaintiffs filed an action in the District Court of Wyandotte County pursuant to K.S.A. 12-712, seeking review of the City's issuance of the special use permit.

On June 14, 1984, the court remanded the special use permit matter to the City Council for consideration of additional facts relating to the transferability of the permit.

Specifically, the court was concerned with an agreement between Wolfe and Laidlaw Industries, Inc., (Laidlaw) a Canadian-based waste management company, whereby Wolfe sold the Southeast Landfill in Kansas City, Missouri, to Laidlaw. As part of the agreement, executed on September 6, 1983, Wolfe covenanted not to compete in the landfill business within 35

miles from downtown Kansas City, Missouri, for five years subsequent to the completion of the Southeast Landfill. The Laidlaw agreement further provided that if Wolfe obtained the right to operate a sanitary landfill within the 35-mile area, it must allow Laidlaw the option of taking over that landfill after all final government approvals are obtained and any threatened or pending litigation has been concluded. Thus, if Laidlaw chose to exercise its option, Laidlaw, and not Wolfe, would be the operator of the proposed landfill.

A public hearing before the City Council was held on this matter on July 19, 1984. At that hearing, the Council received and considered evidence and testimony regarding the agreement between Laidlaw and Wolfe. Wolfe testified he did not believe Laidlaw would be operating the landfill and all he was requesting was a personal, nonassignable permit.

At the conclusion of the hearing the City Council voted 4 to 3 in favor of reaffirming its previous decision to grant Wolfe a special use permit, subject to the permit being restricted and running to the benefit of Wolfe only. The Council unanimously adopted a resolution adopting Addendum Findings of Fact and Conclusions of Law and accepting a Unilateral Agreement by Wolfe setting forth the permit's terms and conditions and Wolfe's agreement to adhere to those conditions.

In its Journal Entry of Judgment, the trial court noted that the terms and conditions of the permit obtained by Wolfe at the rehearing do not appear to comply with the agreement between Wolfe and Laidlaw. Nevertheless, the trial court determined that the agreement between Wolfe and Laidlaw was outside the scope of review and did not affect the reasonableness of the special use permit granted by the City.

The trial court made extensive findings of fact and conclusions of law and concluded the City's decision granting the special use permit was reasonable.

This appeal followed.

Prior to considering the issues raised by the appellants on appeal, let us first set out the scope of appellate review of a decision of the governing body of a city in a zoning or special use permit case. These rules were recently set forth in *Daniels v. Board of Kansas City Comm'rs*, 236 Kan. 578, 585-86, 693 P.2d 1170 (1985):

" '(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.

" '(2) The district court's power is limited to determining

" '(a) the lawfulness of the action taken, and

" '(b) the reasonableness of such action.

" '(3) There is a presumption that the zoning authority acted reasonably.

" '(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

" '(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

" '(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

" '(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

" '(8) An appellate court must make the same review of the zoning authority's action as did the district court.' " (Quoting *Combined Investment Co. v. Board of Butler County Comm'rs,* 227 Kan. 17, 28, 605 P.2d 533 [1980].)

In addition, in *Golden v. City of Overland Park,* 224 Kan. 591, 584 P.2d 130 (1978), we set out several factors which should be considered by the zoning body and which would aid the reviewing court in determining the reasonableness and validity of zoning determinations. Those factors are:

"(1) The character of the neighborhood;

"(2) the zoning and uses of properties nearby;

"(3) the suitability of the subject property for the uses to which it has been restricted;

"(4) the extent to which removal of the restrictions will detrimentally affect nearby property;

"(5) the length of time the subject property has remained vacant as zoned; and

"(6) the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner.

"[7 and 8] the recommendations of permanent or professional staff, and the conformance of the requested change to the adopted or recognized master plan being utilized by the city." 224 Kan. at 598.

As we noted in *Taco Bell v. City of Mission,* 234 Kan 879, 887, 678 P.2d 133 (1984), the traditional tests of reasonableness were not abandoned by the addition of the *Golden* criteria. Rather, the traditional tests were "enhanced by the eight factors which provide a reviewing court with a basis for testing the action of a governing body in a meaningful way."

The parties disagree as to whether the *Golden* criteria are

applicable to special use permit cases. The appellants contend that since the issuance of a special permit triggers the same review for "reasonableness" as does a rezoning case, the eight factors enumerated in *Golden* are equally applicable in special use permit cases. The City, however, argues that this court has never specifically stated that the *Golden* factors are applicable to special use permit cases, and it should not so hold in this case.

The appellants' argument has merit. We have consistently held, in reviewing the grant or denial of a special use permit, the same test of "reasonableness" applies as in rezoning cases. *Gaslight Villa, Inc. v. City of Lansing*, 213 Kan. 862, 864, 518 P.2d 410 (1974); *Creten v. Board of County Commissioners*, 204 Kan. 782, 783, 466 P.2d 263 (1970). This court's purpose in suggesting zoning bodies apply the *Golden* factors was to aid in a more precise definition and application of the "reasonableness" standard. Thus, there is no sound basis for distinguishing special use permit cases from rezoning cases and the factors set forth by this court in *Golden* are applicable to a city's action on a special use permit, where relevant.

Appellants' first issue on appeal is that the City failed to consider the *Golden* standards discussed above prior to granting Wolfe's application for a special use permit. Appellants base this contention on the fact that the City's resolution adopting findings of fact and conclusions of law was not made until six weeks after preliminary approval of the permit was made at the hearing. Thus, the appellants argue the decision to grant the special permit was made weeks before the *Golden* factors were considered by the City.

Appellants' argument fails because the decision made by the City at the end of the four-hour hearing was not a final decision. It was clearly *subject to* a later adoption of findings of fact and conclusions of law. At the City Council hearing, Mayor Reardon stated for the record that any motions to approve or deny the permit should include a directive to the City Planning and Legal Departments to prepare suggested findings of fact and conclusions of law, which would form the basis of the decision made at the hearing. After a half-hour executive session, the Board approved the Planning Commission's recommendation to grant the special use permit "subject to findings of fact and conclusions of law."

The City, in its resolution adopting findings of fact and conclusions of law, set forth the *Golden* criteria and stated that these factors had been considered in arriving at its conclusion. It is not our prerogative on appellate review to tell a local governing body how long it should take in making its decision, so long as the proper matters are considered. We conclude the *Golden* factors were properly considered by the City in the present case.

Appellants next contend the district court erred in holding the City's grant of a special use permit to Wolfe was reasonable in light of Wolfe's noncompetition contract and option with Laidlaw.

The district court held the terms and conditions of the agreement between Laidlaw and Wolfe were outside its scope of review. It specifically held the Wolfe-Laidlaw agreement had no effect upon the reasonableness of the special use permit granted by the City. Therefore, the issue on appeal is whether the district court properly found the terms and conditions of the agreement between Wolfe and Laidlaw outside its scope of review.

The appellants argue Wolfe's failure to disclose the contractual limitations on its ability to own and operate the proposed landfill significantly impacted upon Wolfe's credibility, and the City's grant of a permit to Wolfe under such circumstances was unreasonable. While it is true this information should have been disclosed to the City prior to or during its consideration of the permit application, it does not necessarily follow that all other representations made by Wolfe to the City must be reevaluated.

After the district court judge remanded this issue to the City, another hearing was held, at which time the City was made fully aware of the contract between Wolfe and Laidlaw. After being fully informed of the agreement and its limitations, the City voted to reaffirm its previous decision to grant a special use permit to Wolfe.

The City argues the district court properly ruled this issue to be outside the scope of review of this action. It points out Laidlaw has not yet exercised its option and may never exercise its option. In addition, the City, in its Addendum Findings of Fact and Conclusion of Law, ruled that any attempted transfer of the permit or the rights granted thereunder would render the permit null and void.

Since the City affirmed the permit with full knowledge of the

contract between Laidlaw and Wolfe, and since Laidlaw has not yet attempted to exercise its option under the agreement, there is no controversy at this time. We will not consider and decide questions when there is no actual controversy and where the judgment cannot affect the matter in issue before the court. *In re Estate of Jud*, 238 Kan. 268, Syl. ¶ 3, 710 P.2d 1241 (1985).

The final issue on appeal is whether the district court erred in holding the City's approval of the special use permit was reasonable.

We have already set forth the eight *Golden* factors to be applied in determining the reasonableness of a zoning determination. Also relevant to the question of reasonableness are the factors set out in the City's Special Use Permit Ordinance Section 27-103(1)(C)1. Those factors are:

"a. Whether the proposed use will destroy the aesthetics of the surrounding development (to protect the character of the surrounding development);

"b. Whether the proposed use will result in increasing the amount of vehicular traffic to the point where it exceeds the capacity of the street network to accommodate it;

"c. Whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use of adjoining property;

"d. Whether the noise, vibration, dust, or lighting that would normally be associated with such use is of such duration and intensity as to be objectionable to adjacent property;

"e. Whether the proposed use would pollute the air or water;

"f. Whether the use would destroy an irreplaceable natural resource;

"g. Whether the construction activities or quality of maintenance associated with the use would cause excessive erosion; and

"h. Whether the proposed use would result in overcrowding of land or cause an undue concentration of population."

It is clear that the City considered these factors, as well as the *Golden* factors, in arriving at its decision to grant Wolfe a special use permit to operate the sanitary landfill. The City, in its Findings of Fact, set out the *Golden* criteria and the ordinance standards listed above. Then, in its Conclusions of Law, the City considered and applied each of the factors separately.

The district court concluded the City properly considered both the *Golden* criteria and the ordinance standards in reaching its decision and that the process utilized in reaching that decision was not arbitrary and capricious.

Appellants contend Wolfe's special use permit application was not sufficiently definite and that if a more detailed plan had been

presented to the City, the application would have been denied. In particular, appellants cite the lack of a detailed plan to deal with the possible build-up of methane gas as refuse disintegrates below the landfill surface. Appellants also argue Wolfe's plan to inject unstable mines with fly ash is unworkable and insufficiently detailed.

In its formal Findings of Fact and Conclusions of Law, the City set out very detailed conditions which must be met prior to final approval of the special use permit and noted that the special use permit is dependent upon the approval of final plans. A reading of these detailed conditions precedent and conditions subsequent confirms the appellants' concerns have been considered and dealt with in a very thorough and careful manner.

Our reasoning in *Daniels v. Board of Kansas City Comm'rs,* 236 Kan. at 587, is instructive here:

"We wish to emphasize, however, that this holding does not preclude the plaintiffs from seeking relief from the district court at some future time. As noted above, the city, in granting the special use permit for the landfill, conditioned the granting of the permit on stated conditions precedent and conditions subsequent in order to protect the rights of the landowners. If those requirements are not properly complied with or if the plaintiffs, as adjacent landowners, are subjected to intolerable conditions on the landfill property which would constitute a nuisance, then the plaintiffs may seek appropriate relief in the district court."

Wolfe's failure to provide the City with detailed plans concerning all aspects of the special use permit application did not make the City's grant of the permit unreasonable. Such a finding would render meaningless the detailed conditions precedent and conditions subsequent placed upon Wolfe by the City. As pointed out in *Daniels,* if the conditions set by the City are not properly complied with, the appellants can always seek appropriate relief in the district court.

We are sympathetic to the concerns of appellants about the location of this landfill with its attendant increased traffic, creation of health hazards and detraction from scenic areas. However, the public need for adequate sanitary landfills cannot be ignored since the failure to provide for adequate waste disposal creates health hazards and destroys scenic beauty of greater magnitude, affecting the entire community. No one questions the need for this landfill. The sole question is its location. There are few locations available for landfills in an urban area. An examination of the record shows that learned counsel for ap-

pellants made the City aware of all the objections to this location. The engineers' report and the findings of fact show the City considered the objections in making its decision.

This court's power is limited to determining the lawfulness and reasonableness of the City's actions. There is a presumption the action was reasonable which must be overcome by a preponderance of the evidence. The courts may not substitute their judgment for that of the City. Since there is no question a City has the lawful authority to issue special use permits, the remaining question is the reasonableness of its action in so doing. We have held an action is unreasonable when it is so arbitrary it can be said it was taken without regard to the benefit or harm to the community at large and was so wide of the mark that its unreasonableness lies outside the realm of fair debate. *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 29, 605 P.2d 533 (1980). The issue here was clearly within the realm of fair debate.

Thus, we conclude the district court did not err in finding the City's action granting the special use permit to be lawful and reasonable. The judgment is affirmed.

MILLER, J., dissenting: The special use permit issued by the City is for the operation of a "sanitary landfill," an innocuous enough expression which has found its way into governmental jargon. In plain English, however, we are talking in this case about an enormous garbage and trash dump, where the refuse of the City will be piled and will occasionally be covered by layers of earth, spread about by earth-moving equipment. The operation will be four blocks distant from a large shopping center, now visited by 10,000 people daily. It will be at a higher elevation than the center and will be visible therefrom. It is near homes, a medical building, and other shopping areas. The usual wind currents in the area are from the southwest, and the project is southwest of the shopping center.

While time does not permit me to state my views fully, I respectfully disagree with my colleagues that the action of the City in this case is reasonable. If this is reasonable, then it will be reasonable to authorize the location and operation of other garbage and trash dumps, feed lots for cattle and hogs, and most

any other such venture, at any location in any city—so long as the officials have "considered" and enumerated the appropriate factors.

I respectfully dissent.