NOT DESIGNATED FOR PUBLICATION

No. 124,525

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KAW VALLEY COMPANIES, INC.,
*Appellant*,

v.

BOARD OF LEAVENWORTH COUNTY COMMISSIONERS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAVID J. KING, judge. Opinion filed August 26, 2022. Reversed in part, vacated in part, and remanded with directions.

*Justin J. Johl*, and *Jessica A.E. McKenney*, pro hac vice, of Shook, Hardy & Bacon L.L.P., of Kansas City, Missouri, for appellant.

*Christopher L. Heigele* and *Jacob D. Bielenberg*, of Baty Otto Coronado Scheer PC, of Kansas City, Missouri, for appellee.

Before BRUNS, P.J., ATCHESON and ISHERWOOD, JJ.

PER CURIAM: This appeal is brought under the provisions of K.S.A. 19-223. It arises out of the Board of Leavenworth County Commissioners (Board of County Commissioners) approval of a Resolution granting a special use permit (SUP) to Kaw Valley Companies, Inc. (Kaw Valley). Under the Resolution, Kaw Valley is authorized to conduct a sand dredging operation in an unincorporated part of Leavenworth County a few miles from the Kansas River. On appeal, Kaw Valley argues—among other things— that two of the conditions contained in the Resolution are unreasonable. In response, the

1

Board of County Commissioners contends that the Resolution is adequate as written because it contemplates further negotiations.

Based on our review of the record on appeal, we do not find the conditions set forth in the SUP to be unlawful or categorically improper. However, we do find that the conditions set forth in the Resolution adopting the SUP are not specific enough to adequately allow for judicial review to determine their reasonableness. Likewise, we find that some of the conditions are not specific enough to allow Kaw Valley to make a well-informed decision whether to go forward with the project. Accordingly, Kaw Valley has been "aggrieved" by the adoption of the SUP within the meaning of K.S.A. 19-223. Thus, we reverse the district court's decision, vacate the Resolution granting the SUP application, and remand this matter to the Board of County Commissioners for further proceedings.

FACTS

On January 16, 2019, Kaw Valley filed an application for a SUP with the Leavenworth Planning Department. In the application, Kaw Valley represented that it had leased 224 acres of nonresidential real property near 166th Street and Lenape Road in rural southern Leavenworth County. Kaw Valley desired to change the existing agricultural use of the land to an open surface sand mining operation "to quarry and stockpile sand from the underlying deposits.

Kaw Valley further represented that there would be truck traffic in and out of the quarry on weekdays. According to the representations made in the application, the quarry would have "[a]n estimated 8 to 10 truck trips per hour or 64 to 80 truck trips per day . . . to the site each regular weekday between the hours of 7:00 a.m. and 3:00 p.m." According to Kaw Valley, the quarry would produce approximately 2,000 tons of sand

2

each day of operation and use a weight scale to ensure that the outgoing trucks do not exceed legal weight limits for the nearby public roadways.

In a Plant Operations Memorandum prepared by Cook, Flatt & Strobel Engineers P.A. for Kaw Valley, dated June 28, 2019, additional details regarding the quarry were identified. Specifically, the memorandum stated that "[o]nce the sand has been excavated, it would be stockpiled on the site to await transport to Kaw Valley's Edwardsville processing site . . . ." In addition to Kaw Valley, other companies could also send trucks to the quarry to load sand and send it to construction sites or concrete mixing plants.

Prior to filing its application for a SUP, Kaw Valley had several preliminary discussions with representatives of Leavenworth County. Likewise, as part of the SUP application process, Kaw Valley submitted various supporting documents and obtained various permits from state and federal agencies relating to the proposed sand-dredging operation. Following the filing of the SUP application, Kaw Valley worked with the professional staff of the Leavenworth County Public Works Department regarding the proposed project.

The staff of the Public Works Department considered two possible routes to be designated for use by the increased truck traffic that would result from the operation of the quarry. Both routes that were proposed connect to Highway K-32—which is several miles north of the project location—and would allow for the extracted sand to be transported to Kaw Valley's processing site in Edwardsville. The proposed western route would have required the trucks to travel 3.8 miles on rural county roads, and the proposed eastern route would have required the trucks to travel 4.2 miles on rural county roads.

Although Kaw Valley's engineers preferred the western route, Leavenworth County's Public Works Department ultimately recommended the eastern route. After receiving a Pavement Exploration Report from its engineers, Kaw Valley purchased real

3

property adjacent to the site of the proposed quarry to construct a private roadway. As a result, the proposed distance for trucks hauling sand to be driven on the rural county roads was reduced from 4.2 miles to 3.3 miles.

On July 10, 2019, the Leavenworth County Planning and Zoning Commission held a public hearing on Kaw Valley's SUP application. Approximately 25 members of the public spoke during the public comment portion of the hearing. Of these, only one member of the public spoke in favor of the SUP application. There are also copies of e-mails and letters in the record from members of the public. Again, most of the written documentation was submitted in opposition to the SUP application. At the end of the public hearing, the Planning and Zoning Commission recommended that the Board of County Commissioners deny Kaw Valley's SUP application based on "[p]ublic health concerns including safety of the haul route" and "[i]nsignificant economic gain to the County."

After the Planning and Zoning Commission issued its recommendation, the County requested an additional study from Kaw Valley relating to the pavement of the roads on the eastern route. The purpose of this study was to determine whether the rural county roads could accommodate the additional wear and tear that would result from the increased truck traffic if the SUP was approved. Specifically, the County was concerned about the potential damage to the county roads due to truck traffic to and from the quarry during the 25-year duration of the proposed SUP.

In response to the County's request, Kaw Valley retained Kaw Valley Engineering—which evidently has no relationship to Kaw Valley Companies, Inc.—to conduct an evaluation of the proposed eastern route "to define the existing pavement and the subsurface conditions at the proposed haul road and to evaluate the potential impact of the increased traffic loading from the sand plant operations." In performing its study, the Kaw Valley Engineering firm took core samples at nine points on the eastern route.

4

On November 19, 2019, Kaw Valley Engineering issued a Pavement Exploration Report to Leavenworth County. In the report, the engineering firm rendered the following opinion:

"Because the road is in good condition structurally and has been properly maintained, [Kaw Valley Engineering] thinks that at least 50 percent of the structural capacity of the road remains. Using the field and laboratory data from the exploration the 1993 AASHTO Design Guide analysis procedures estimate the proposed haul road has a lifetime traffic capacity of between 830,000 and 1,170,000 [Equivalent Single Axle Loads (ESAL)] before substantial maintenance to rebuild the road would be required. Since the proposed additional traffic load of 524,000 ESAL is equal to, or slightly less than 50 percent of the lifetime capacity of the roadway, it is [Kaw Valley Engineering]'s opinion that the existing proposed haul road has sufficient remaining life to carry the anticipated sand plant traffic over the next 10 years."

In addition, Kaw Valley Engineering opined:

"Even though the proposed haul road is in good condition, it is unknown how much heavy traffic has used the proposed haul road or what the remaining life of the pavement is. However, since the road is in good condition, it is our opinion that the existing pavement has at least 50 percent of its total traffic capacity left. If at least 50 percent of the lifetime capacity remains, the haul road should be able to support the new levels of traffic for at least 10 years.

. . . .

"Routine maintenance on the proposed haul road in the future should consist of a minimum of crack sealing on the asphalt surfaced portion of the road . . . on a periodic basis. If heavier maintenance actions are required in the future, development of those procedures would require additional engineering work at that time."

Subsequently, the County asked Mitch Pleak, P.E., of Olsson Engineering—who has evidently been designated to serve as county engineer pursuant to K.S.A. 68-501—to

5

review Kaw Valley Engineering's pavement report. After reviewing the report, Pleak believed that the existing pavement life of the proposed haul route would not be sufficient for the proposed 25-year term of the SUP. Instead, Pleak concluded that the county roadway would require a complete reconstruction. Olsson recommended that the reconstruction take place prior to commencement of hauling by Kaw Valley.

In an e-mail to the Leavenworth County Administrator Mark Loughry and Lauren Anderson from the Public Works Department dated December 4, 2019, Pleak recommended:

> "As previously reported, operations are estimated at 25 years or longer. With the existing pavement life not lasting the length of the proposed operation, the roadway will need to be replaced. Staff will recommend the following to the Board of County Commissioners: The Applicant shall bring the specified route/roadway up to County standards prior to hauling. Design and construction of the roadway shall be funded entirely by the Applicant. Complete funds for the improvement shall be received by the County prior to design. Funds may need to be adjusted as the project progresses through construction. A formal executed agreement between the County and the Applicant detailing all requirements and responsibilities of such improvements will be required."

In addition, Leavenworth County retained another engineering firm, Wilson & Co., Inc., to review the engineering studies that had been prepared to that date. In its report dated August 16, 2019, Wilson & Co. estimated the costs of anticipated road required maintenance over the life of the proposed SUP. The Public Works Department also sent a letter to Dan Hays, general manager of the sand division at Kaw Valley, dated January 2, 2020, in which it included—among other things—13 questions seeking clarification of several items contained in the Pavement Exploration Report.

On January 8, 2020, counsel for Kaw Valley sent an e-mail to various representatives of the County in which he stated—among other things—that "our client

does not believe it is necessary to build a brand-new road for the route proposed by the County ('Route') at any time during the life of the SUP." In response to counsel's e-mail, Pleak asserted that "as stated in the report regarding the paved portion of the route, the existing proposed haul road has sufficient remaining life to carry the proposed [quarry] traffic over the next 10 years before the road needs to be rebuilt." On January 10, 2020, an engineer retained by Kaw Valley sent an e-mail giving preliminary answers to the 13 questions that had previously been sent by the County regarding the Pavement Exploration Report.

On June 22, 2020, engineers for Kaw Valley submitted a Traffic Impact Study to Leavenworth County. The study recommended that Kaw Valley make improvements to four intersections along the proposed haul route and provide for additional signage due to the increased truck traffic. However, the Traffic Impact Study concluded:

> "[T]he proposed Lenape Sand Quarry by Kaw Valley could be safely and reasonably operated with its trucks on the County and KDOT [road] network. Kaw Valley would compensate Leavenworth County with a road usage fee that would be paid on an agreed-upon basis gauged on the volume of sand extracted from the Lenape site. Kaw Valley would essentially pay a per-ton royalty to the County based on the amount of sand shipped from the site each month or yearly quarter. Kaw Valley would further be responsible for the costs of roadway improvements to the quarry truck route including the intersection improvements to the 158th & Golden Road curve, 158th & Loring Road and Loring Road and Loring Drive. Since Kaw Valley would be paying for the improvements, the company would expect that the work would be administered and bid by their own forces (subject to the oversight and approval of Leavenworth County's Public Works Engineering and Inspection Staff). The planning and execution of the work would be done in accordance with the applicable County and KDOT standards. Kaw Valley would be allowed to supply their own roadway construction materials and select their preferred Contractors subject to the approval of the County."

7

On June 22, 2020, engineers retained by Kaw Valley submitted an appendix to the Pavement Exploration Report. The appendix consisted of more formal responses to the 13 questions previously asked by the County seeking clarification of the report. The following day, the County Engineer submitted a letter to the Board of County Commissioners in which he reiterated that "[d]ue to the existing pavement life not carrying the duration of the proposed SUP's operational goal of 25 years, the roadway would require a full reconstruction in lieu of the document's recommended substantial maintenance of a mill and overlay." Pleak explained that "[a]ccording to the Pavement Exploration Report, the proposed haul road only has sufficient remaining life to carry the anticipated sand plant traffic over the next 10 years." As such, Pleak recommended that the road "be reconstructed due to the existing pavement not supporting the additional 15 years of the proposed SUP's operational goal of 25 years."

In addition, Pleak made the following specific recommendations to the Board of County Commissioners should they decide to approve Kaw Valley's SUP application:

- "The Applicant [Kaw Valley] shall be responsible for bringing the route/roadway up to county standards to include recommended improvements detailed in the submitted reports prior to hauling.
- "Design and construction of the roadway shall be funded entirely by the Applicant. Funds for said design/improvements shall be received by the County prior to design. Funds may need to be adjusted as the project progresses through construction.
- "A formal executed agreement between the County and the Applicant detailing all requirements and responsibilities of the parties will be required.
- "The reconstruction of the roadway will be in lieu of a traffic impact fee.
- "After the roadway construction improvement is completed and accepted by the County, the applicant will not be responsible for any additional fees associated with the haul route roadway."

8

On July 8, 2020, the Board of County Commissioners held a public hearing on Kaw Valley's SUP application. At the hearing, a proposed Resolution was presented by the Department of Planning and Zoning. The Board also heard from counsel for Kaw Valley who presented information in support of the SUP application. Also, an engineer retained by Kaw Valley made a presentation in support of the application and answered questions from members of the Board of County Commissioners.

Following the official presentations, the Board heard public comment regarding the proposed SUP application. During this portion of the hearing, 14 members of the public spoke in opposition of the SUP application and none spoke in favor. Notwithstanding the Planning Commission's recommendation that Kaw Valley's SUP application be denied, the Department of Planning and Zoning recommended to the Board of County Commissioners that the application be granted upon certain conditions.

One of the conditions recommended by the Department of Planning and Zoning was that "the entire haul route be completely replaced to County standards prior to the applicants [Kaw Valley] engaging in any activities." The rationale for this condition was that the failure to require reconstruction of the existing roadway "poses a significant risk to the public health, safety and welfare." The Department of Planning and Zoning also recommended that Kaw Valley be responsible for payment of the reconstruction prior to the commencement of hauling in lieu of being required to pay an annual traffic impact fee and royalties. In support of this position, the Department of Planning and Zoning pointed to the fact that the Pavement Exploration Report prepared by engineers retained by Kaw Valley found that "substantial maintenance" would be needed in 10 years if the SUP application was granted.

In response, Kaw Valley proposed that it instead pay an annual traffic impact fee as well as a royalty based on the amount of sand removed from the site to compensate Leavenworth County for the wear and tear caused by the additional truck traffic. In Kaw

9

Valley's opinion, the proposed traffic impact fees and royalties would be sufficient to cover the potential maintenance costs. It was the position of Kaw Valley's engineer that based on the core samples obtained from proposed haul route, the pavement was in "remarkably good condition" and that "[c]hip and seal or maybe an overlay would probably be the only thing required at the 10 years . . . ." However, the engineer admitted that the scope of his analysis was for only 10 years.

The Board of County Commissioners also received hundreds of written comments submitted by members of the public regarding the proposed sand-dredging operation. The vast majority of those commenting opposed the SUP based on health and safety concerns. The location of the project concerned many members of the public due to the increased truck traffic on the rural county road that might lead to traffic accidents. Specifically, members of the public expressed concerns for the safety of children traveling to and from school as well as area residents traveling to and from work. Other members of the public expressed concerns regarding harmful effects to wildlife as well as to their habitats and detrimental effects to nearby farm animals. Some members of the public were also concerned with potential pollution, water contamination, increased noise levels, and a decrease in the property values in the area.

At the conclusion of the public hearing, the Board of County Commissioners continued the matter for a final determination to be made on July 15, 2020. The day before the Board took final action, the County Engineer provided the Board with a letter in which he summarized his position. In his letter, Pleak concluded:

- "Based on our understanding of the pavement exploration report, the 1993 AASHTO Design Guide was used to determine the remaining life cycle of the pavement. Furthermore, Kaw Valley Engineering assumed, based on their analysis of the roadway, that only 50 percent of the structural capacity of the roadway remains. This analysis was based on a lifetime traffic capacity in ESAL's of between 830,000 and 1,170,000 and assuming the additional traffic

10

load only from sand plant trucks (not including existing traffic) would be 524,000 ESAL's. If the more conservative number of 830,000 ESAL's is used, as indicated by Kaw Valley's response letter, the structural capacity reduction is further increased to 63 percent, which results in a remaining life span of around 7 to 8 years as opposed to the 10 years indicated in the report.

- "Regardless of the discrepancy of life span remaining, it is still significantly less than the Sand Plant's operational time of 25 years. Based on the report by Kaw Valley, maintenance will be required during the 10 years and at the end of the 10 years, 'Substantial Maintenance' will be required. According to Kaw Valley 'Substantial Maintenance' would involve a mill and overlay of the roadway. In our opinion, assuming only a mill and overlay will be required after 10 years of continued truck traffic on an approximately 80-year-old roadway would not be sufficient.

- "According to the Federal Highway Administration (FHWA), the Pavement Life Cycle is divided into 6 phases.
    - Materials Production
    - Pavement Design
    - Construction
    - Use
    - Maintenance and Preservation
    - End of Life

- "In our opinion, the roadway is currently in Use with routine Maintenance and Preservation at this time. Based on our understanding of the report prepared by Kaw Valley, the Structural Capacity of the roadway will reach its design life in 7 to 10 years from the start of sand plant operation. Adding a mill and overlay at that time could help address specific pavement deficiencies and slow the rate of deterioration of the base courses but is still classified as maintenance and preservation by FHWA and in our opinion, will likely only increase the life of the pavement a few more years. Continued use by sand plant trucks will noticeably accelerate the deterioration of the new wearing course and/or additional wearing courses, if constructed and significantly decrease the overall structural capacity of the roadway, especially the pavement base, leading to more deep seated failures such as potholing, rutting, random cracking, reflective

11

cracking and transverse cracking from brittle pavement layers below the new surface courses.

- "It is our opinion that, after the design life of 7 to 10 years, the pavement will have reached is End of Life per the AASHTO design guide and per the definitions provided by FHWA. We anticipate that full depth removal and replacement with possible subgrade stabilization will be required at this time."

At its meeting on July 15, 2020, the Board of County Commissioners took final action on a proposed Resolution to approve Kaw Valley's SUP application subject to several of the conditions that are discussed above. In doing so, the Board considered the factors—both in support of and in opposition to the application—set forth in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978). The original motion was for the adoption of the proposed Resolution 2020-23 with the incorporation "by reference of the findings and recommendations contained in the staff report dated July 8, 2020, and the [County Engineer's] report dated June 23, 2020." But the County Engineer's letter dated July 14, 2020, was not incorporated into the motion.

The conditions expressly identified in the proposed Resolution included—among other things—that Kaw Valley "bring the specified route/roadway up to County standards prior to hauling" and that "[d]esign and construction of the roadway shall be funded by the applicant . . . prior to design." In addition, the conditions in the proposed Resolution included a provision that "[a] formal executed agreement between the County and the applicant dealing with all requirements and responsibilities of such improvement will be required." Likewise, the proposed Resolution provided that "the conditions listed shall be complied with and supporting documentation for such shall be provided to the Planning and Zoning Department within 30 business days."

Before the Board of County Commissioners voted on the proposed Resolution, the Board amended the proposed Resolution by motion to include a "clawback" provision to provide that Kaw Valley would receive "reimbursement in proportion to [its] share of the

12

future use of the road" should other businesses move into the area adjacent to the haul route. Moreover, the Board passed a motion to amend the proposed Resolution to exclude the "road design and construction" from the condition requiring that "all conditions listed shall be complied with and supporting documentation of such compliance provided to the Planning and Zoning Department within 30 business days." Ultimately, the Board passed Resolution 2020-23 as amended with four commissioners voting in favor and one commissioner voting against the motion.

On July 22, 2020, Resolution 2020-23 was signed by the Board of County Commissioners. Unfortunately, the language in the final written Resolution does not mirror the language of the Resolution passed in several respects. Several conditions have been reworded and at least two provisions did not make their way into the Resolution. First, although "the staff report dated July 8, 2020" was to be incorporated by reference, it is not mentioned in the Resolution. Second, although the conditions set forth in the motion expressly excepted "the required road design and construction" from the 30-day requirement for the submission of documents by Kaw Valley to the Planning and Zoning Department, this language is also not included in the Resolution.

After the Resolution was signed by the Board of County Commissioners, it appears that the parties held discussions regarding the formal agreement to be executed by the parties relating to the requirements and responsibilities of each as it relates to the required improvement of the roadway. While these discussions were ongoing, Kaw Valley filed an appeal in the district court pursuant to K.S.A. 19-223. On September 21, 2021, after conducting a bench trial and hearing the arguments of counsel, the district court denied Kaw Valley's appeal and, by doing so, effectively affirmed the decision of the Board of County Commissioners.

Thereafter, Kaw Valley filed a timely notice of appeal.

13

ANALYSIS

*Issues Presented*

On appeal, Kaw Valley contends that several of the conditions imposed by the Board of County Commissioners in adopting the Resolution granting its SUP application are unreasonable. Moreover, Kaw Valley contends that one of the conditions constitutes a taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution. In response, the Board of County Commissioners contend that the conditions imposed on the granting of Kaw Valley's SUP application were reasonable based on the evidence presented at the public hearing. In addition, the Board contends that the imposition of conditions on the granting of an SUP application do not constitute an unconstitutional taking of property.

*Special Use Permits and Conditions*

K.S.A. 12-741 et seq. grants cities and counties the authority to enact planning and zoning regulations for the protection of the public health, safety, and welfare. Specifically, K.S.A. 12-755(a)(5) grants a city or county's governing body to issue "special use or conditional use permits" to allow a particular land use that is not allowed under existing zoning regulations. The procedure to be used by a city or county in considering a SUP application is set forth in K.S.A. 2021 Supp. 12-757. See *Manley v. City of Shawnee*, 287 Kan. 63, 67, 194 P.3d 1 (2008). We pause to note that there is no allegation in the present case that the Board of County Commissioners failed to follow the statutory procedure.

As the Kansas Supreme Court has recognized, "[c]onditions are commonly imposed on special use permits." *Johnson County Water Dist. No. 1 v. City Council of Kansas City*, 255 Kan. 183, 190, 871 P.2d 1256 (1994) (citing 3 Anderson, American Law of Zoning, § 21.30 [3d ed. 1986]). So long as these conditions are reasonable, a

14

reviewing court should uphold the conditions. *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 305, 49 P.3d 522 (2002). This is because cities and counties have the authority to promote public health, safety, and welfare. Hence, conditions may be imposed on a SUP that are "rationally related to those objectives and [are] not unreasonable or oppressive." *Johnson County Water Dist. No. 1*, 255 Kan. at 191.

Under the authority granted to it by the Kansas Legislature, Leavenworth County has adopted the Zoning and Subdivision Regulations for Leavenworth County, Kansas (August 1, 2006, Updated January 13, 2022). These zoning regulations apply to the unincorporated portions of the County. Article 1, Section 1 of the zoning regulations provides:

> "The zoning regulations . . . herein established . . . to promote, in accordance with present and future needs, the safety, morals, order, convenience, prosperity, and general welfare of the citizens of Leavenworth County, Kansas, and to provide for efficiency and economy in the process of development, for the appropriate and best use of land, for the convenience of traffic and circulation of people and goods . . . ."

Furthermore, Article 22 of the County's zoning regulations applies to "Special Use Permits and Temporary Use Permits." Section 1 of Article 22 recognizes that "[c]ertain uses . . . are of a type or nature which may be desirable . . . to be located in the County, but, due to their nature, may be incompatible with the surrounding area without a thorough review and possibly the placing of conditions on the use to protect health, safety and welfare." Additionally, Article 22, Section 2 sets out the procedure to be followed in applying for an SUP and Article 22, Section 3 sets out the procedure to be followed by the County in considering an application.

Significant to the issues presented in this case, Article 22, Section 5 addresses "Conditions on Approval" of an SUP application:

15

"Every Special Use Permit issued by Leavenworth County to a non-governmental person, business or corporation shall be valid for a specified period of time. When necessary, the Board of County Commissioners may attach conditions to the approval of a Special Use Permit. Failure to abide by the conditions of the approval by the applicant shall be cause for an action to rescind approval of the Special Use Permit. "

The "Special Use Permit Application" submitted by Kaw Valley to the Board of County Commissioners on January 16, 2019, recognized that "[c]onditions will be attached to most Special Use Permits." The application also recognized that an SUP "may impose any conditions they consider necessary to ensure public safety, health, and welfare. "

*Standard of Review*

In *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980), the Kansas Supreme Court articulated the limited standard of review to be applied by appellate courts in zoning cases. Subsequently, our Supreme Court applied this standard of review to decisions granting or denying SUP applications. *Daniels v. Board of Kansas City Comm'rs*, 236 Kan. 578, 584, 693 P.2d 1170 (1985). A few years later, the court also applied this standard of review to appeals challenging the conditions imposed by a governing body in granting a SUP application. *Johnson County Water Dist. No. 1*, 255 Kan. at 184.

The *Combined Investment* standard provides:

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.
"(2) The district court's power is limited to determining
        (a) the lawfulness of the action taken, and
        (b) the reasonableness of such action.
"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body; and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court." 227 Kan. at 28.

In addition, our Supreme Court has found that the factors set forth in *Golden*, 224 Kan. at 596, should be considered by governing bodies in determining whether to grant or deny special use permits. *Johnson County Water Dist. No. 1*, 255 Kan. at 184-85. Formal findings and conclusions based on the *Golden* factors are not required. See *Manly*, 287 Kan. at 76. Moreover, traditional tests of reasonableness have not been replaced by the *Golden* factors. Instead, these tests have been "enhanced by the eight factors which provide a reviewing court with a basis for testing the action of a governing body in a meaningful way." *K-S Center Co. v. City of Kansas City*, 238 Kan. 482, 494, 712 P.2d 1186 (1986).

Because cities and counties are entitled to determine how land within their boundaries is zoned, "[n]o court should substitute its judgment for the judgment of the elected governing body merely on the basis of a differing opinion as to what is a better policy in a specific zoning situation." *Landau v. City Council of Overland Park*, 244 Kan. 257, 274, 767 P.2d 1290 (1989) ("Elected officials are closer to the electorate than the courts and, consequently, are more reflective of the community's perception of its image."). Even so, this does not mean that a reviewing court is to simply rubber stamp a

zoning decision made by a city or county. Instead, there must be a meaningful review on appeal to determine the lawfulness and the reasonableness of the governing board's action. See *143rd Street Investors, L.L.C. v. Board of Johnson County Comm'rs*, 292 Kan. 690, 709-15, 259 P.3d 644 (2011). In addition, we note the challenger to the zoning decision—in this case Kaw Valley—has the burden to show by a preponderance of the evidence that the action taken by the governing body was not reasonable. 292 Kan. at 720.

We also find it important to recognize that this appeal involves interpretation of Resolution 2020-23, which was adopted by the Board of County Commissioners on July 22, 2020. The interpretation of a county resolution involves a question of law over which we have unlimited review. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). Like a statute, the words in a resolution "should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it." *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001). Further, it is not the function of the court to rewrite a statute, ordinance, or resolution. See *Rural Water Dist. No. 2 v. City of Louisburg*, 288 Kan. 811, Syl. ¶ 3, 207 P.3d 1055 (2009); *State v. Prosper*, 260 Kan. 743, 747, 926 P.2d 231 (1996).

*Reasonableness of Conditions Imposed*

Kaw Valley primarily focuses on 2 of the 22 conditions contained in Resolution 2020-23. The first condition—found in paragraph 2(a) of the Resolution—relates to the requirement that Kaw Valley bring the rural county road on the proposed route for the hauling of sand from the quarry "up to county standards" and to pay for the improvements. The second condition—found in paragraph 22 of the Resolution— requires that Kaw Valley comply with all the conditions within 30 business days from the date on which the SUP application was approved.

In its entirety, Condition 2(a) of Resolution 2020-23 states:

> "Kaw Valley shall bring the specified route/roadway up to county standards prior to hauling ('improvement.'). Design and construction of the improvement shall be funded by Kaw Valley. Funds for the improvement shall be received or otherwise adequately secured by the county prior to the initiation of design and construction of the improvement. Funds may need to be adjusted as the project progresses through completion."

The Board of County Commissioners argues that it is unnecessary for Resolution 2020-23 to contain additional information regarding the conditions required because "there was no final decision, and [Kaw Valley] knew negotiations would continue." In support of this argument, the Board refers us to paragraph 3 of the Resolution which provides that "[a] formal executed agreement between the county and . . . Kaw Valley detailing all requirements and responsibilities of the parties regarding such improvement shall be required." Thus, the Board argues that Resolution 2020-23 was akin to a preliminary approval of an SUP.

The Board also cites *K-S Center Co.*, 238 Kan. 482, for the proposition "that preliminary approval of a special use permit is a well-recognized concept in Kansas." In *K-S Center Co.*, a governing body expressly voted "to grant preliminary approval of the special use permit, subject to the drafting of suggested Findings of Fact and Conclusions of Law by the City Planning and Legal Departments for later submission to the Council." 238 Kan. at 484. But in this case, a review of the minutes of the meeting held on July 15, 2020, reveals that there was no motion to grant preliminary approval to Kaw Valley's SUP application. Rather, the minutes state that the Board passed a motion "to approve . . . the application for a special use permit submitted by Kaw Valley Companies, LLC" and to adopt Resolution 2020-23 as amended.

19

If the Board desired to simply grant preliminary approval to the application submitted by Kaw Valley, it could have easily done so by approving a motion like the one passed by the governing body in *K-S Center Co.*, which made it clear that it was only granting preliminary approval. However, no such motion was presented, and the Board instead approved Resolution 2020-23 subject to conditions. Accordingly, we conclude that the Board took final—and not preliminary—action on Kaw Valley's SUP application.

As discussed above, it is common for a governing body to approve an SUP application subject to reasonable conditions. Moreover, we do not find it to be categorically improper for a governing body to require an applicant to pay for certain public improvements as a condition for granting an SUP application. The particular condition must be reasonable under the circumstances. Nor do we find it to be categorically improper to leave some of the procedural or technical details regarding a particular condition for further good-faith negotiations and final agreement between the governing body and the applicant.

Notwithstanding, we find that a condition required by the governing body in granting an SUP application must be sufficiently definite as to its essential terms to allow for a judicial determination of its reasonableness on appeal. See *In re JSCL, LLC CU Permit*, 253 A.3d 429, 442 (Vt. 2021) ("To be valid, a permit condition must contain sufficiently definite standards for the applicant to follow."); *Bernstein v. Board of Appeals, Village of Matinecock*, 302 N.Y.S.2d 141, 146, 60 Misc. 2d 470 (1969) (conditions imposed on special use permit "must be sufficiently clear and definite" that parties are not left in doubt "concerning the extent of the use permitted"); see also *Weld v. Board of Appeals of Gloucester*, 345 Mass. 376, 378-79, 187 N.E.2d 854 (1963). In this case, Condition 2(a) falls short of the standard of language that is sufficiently clear and definite to provide Kaw Valley with a path forward.

20

In the present case, we do not find that the language of Resolution 2020-23 sufficiently identifies the essential terms necessary to determine the reasonableness of the conditions imposed. Likewise, we do not find that the language of the Resolution is sufficient to allow Kaw Valley to know whether it is financially feasible to continue with the proposed sand-dredging operation. In particular, we find paragraph 2(a) is incomplete and lacks significant information regarding what the Board of County Commissioners is requiring Kaw Valley to do. We also find it significant that although the motion passed by the Board excepted the "road design and construction" from the requirement that "all conditions listed shall be complied with and documentation of such compliance provided to the Planning and Zoning Department within 30 business days," this exception never made it into paragraph 22 of the written version of the Resolution.

Specifically, we find paragraph 2(a) to be deficient in the following respects:

- Although it appears from other documents in the record that the Board's intent is to require a complete reconstruction of the rural county roadway to be used as the haul route in advance, the Resolution simply states that "Kaw Valley shall *bring the specified route/roadway up to county standards* prior to hauling . . . ." (Emphasis added.)
- Neither the "route/roadway" to be improved nor the "county standards" to be followed are identified in the Resolution. Likewise, counsel for the Board was unable to identify such standards in either his brief or during oral argument.
- Even though the County Engineer's letter dated July 14, 2020, identifies several other improvements—including drainage structures, widening of at least one intersection, and additional traffic signage—the Resolution does not mention these other improvements and this letter is not incorporated by reference as are various other documents.

21

- While the Resolution provides that Kaw Valley shall fund the "[d]esign and construction of the improvement," it does not provide who is responsible for selecting the design consultant or the contractor.

- The Resolution provides that "[f]unds for the improvement shall be received or otherwise adequately secured by the county *prior to the initiation of design and construction* of the improvement." (Emphasis added.) Moreover, it recognizes that "[f]unds may need to be adjusted as to the project progresses through completion." However, the Resolution does not include a preliminary estimate of the cost of design and construction nor is sufficient information provided upon which a reasonable estimate could be obtained to determine the amount of the payment or security required prior to the commencement of design.

Again, we recognize that the Board of County Commissioners—and not this court—has the authority to prescribe, change, or refuse zoning to promote the health, safety, and welfare of its citizens. We also recognize that it is appropriate for the Board to impose reasonable conditions when granting an SUP application. Furthermore, we recognize that there is a presumption the Board acted reasonably. Nevertheless, we find that the conditions being required by a governing body when taking final action on an SUP application must be sufficiently definite to allow a court to determine its lawfulness and reasonableness in an appeal brought under K.S.A. 19-223. Likewise, if SUP is so indefinite that the applicant cannot reasonably determine what is required under its terms, then the applicant has been "aggrieved" by the Board of County Commissioners action permitting the statutory appeal.

In summary, we find that Resolution 2020-23 does not mirror the actual motion passed by the Board in approving Kaw Valley's SUP application, it fails to sufficiently define the conditions the Board of County Commissioners seeks to impose on Kaw Valley, and it does not include the essential terms necessary for this court to determine

22

the reasonableness of such conditions. Similarly, the Resolution does not provide sufficient information to the applicant to make an informed decision whether to comply with the conditions or withdraw from the proposed project. Consequently, we conclude that Resolution 2020-23 is too vague and indefinite to be enforced as written and must be vacated. We may vacate the resolution and, thus, the SUP without remanding to the district court for the ministerial task of entering a new judgment to that effect. Our decision voids the SUP—leaving the Board of County Commissioners to go forward from the posture of these proceedings in July 2020 immediately before its consideration of and vote on the resolution.

*Constitutionality of Conditions*

Kaw Valley also contends that that the conditions set forth in paragraph 2(a) of Resolution 2020-23 are unconstitutional under the *Nollan-Dolan-Koontz* line of decisions issued by the United States Supreme Court. See *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 605, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013); *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994); *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1989). These cases provide that under certain circumstances, it is unconstitutional for a governing body to place excessive conditions on those seeking land-use permits.

However, it is unnecessary for us to address this issue in light of our decision to vacate Resolution 2020-23. This is because at this point in time, there has neither been a "taking" of property nor has there been a showing that the Board of County Commissioners has impermissibly interfered with Kaw Valley's constitutional rights.

CONCLUSION

In conclusion, we find that the proper remedy under the circumstances presented is to reverse the district court's decision, to vacate Resolution 2020-23, and to remand this matter to the Board of County Commissioners for further proceedings consistent with this opinion. As discussed above, it is not the role of this court to rewrite the Resolution, to determine whether the SUP application should be granted, or to decide what conditions—if any—should be imposed on Kaw Valley to protect the health, safety, and welfare of the citizens of Leavenworth County. Those responsibilities fall squarely within the power of the Board of County Commissioners as granted to it by the Kansas Legislature.

Reversed in part, vacated in part, and remanded with directions.